The first case on our docket this morning is Supreme Carpentry and Drywall v. Contegra Construction Co., 523-0689. Appearing for the appellant is Mr. Orlando, is that correct? It is. All right, when you're ready, you may approach and begin, sir. Thomas Orlando for Travelers' Property, Casualty Insurance Company of America. May it please the Court. This case raises the issue of whether the agreement between Contegra and Travelers to value the work on a time and materials basis was in furtherance of the party's performance under the insurance policy or in novation of the insurance policy. It is often said that the three most important factors in determining the desirability of a property are location, location, location. Here, the three most important factors in determining the outcome of this appeal are valuation, valuation, valuation. Every document, every communication in the record shows that the parties were working towards valuing the loss under an insurance policy. And I'll give some more examples later, but I'd like to point to an early one here. I think the document that's found in the record at 1028-1033 is very instructive. It's the letter of Inline. Inline was the consult that Travelers was using. I don't have the date written here. It was in March or April of 2016. It was at the time when the parties were concluding the mitigation and demolition aspect of the work and getting ready for the reconstruction. And the record shows that initially, when the loss occurred, the parties set out to value the loss under the policy through the use of estimates. Inline prepared an estimate for Travelers for the mitigation and demolition, and McDonald who performed that work, they prepared an estimate. The estimates were different, and it turns out at the end of the day, both of the estimates were understated. And so at that point in time, the parties agreed that Travelers through Inline would take a look at the McDonald invoices for the mitigation and demolition and audit those invoices to determine what was the value of that work, and they ultimately settled that under the insurance policy. There's no contention that they did anything other than settle that phase of the work under the insurance policy as the valuation for the work. At the same time, they decided, okay, the estimate process did not work for that phase, so we're not going to bother with estimates for the reconstruction phase. We're going to look at the invoices. We're going to do a time and material analysis for the reconstruction phase going forward. And if you look at that document at 1028 to 1033, you will see that Inline was requesting, so they're sort of in the middle of this. They're getting ready to do the audit of the work that was already done on the first phase. They're looking forward to what they're going to do once the reconstruction starts. And if you look at the laundry list of items, they're requesting basically the same type of thing for the first phase, the work that's already been done, and the next phase of what they're going to do. All of this suggests that they were valuing the loss under the insurance policy for both phases. Nothing in that correspondence would suggest that phase one was to be under the evaluation of the work under the insurance policy and phase two was to be some other construction contract that novated the policy. I think it's important for the court to bear that in mind as it goes through this issue. What really was the difference between what Inline was doing on these two phases? And yet somehow we're to believe that under the first phase it was evaluation under the insurance policy, but on the second phase it became a new construction contract that obliterated the insurance policy. So with that background, let's talk a little bit about novation. The circuit court held that the parties substituted the insurance policy with a construction contract. Now, a novation is a substitution by mutual agreement. And I cannot overemphasize that enough. By mutual agreement, it takes both parties to agree that they're going to extinguish something and enter into something new. It's a substitution by mutual agreement of a new debt or obligation for an existing one, which is thereby extinguished. Well, this begs the question, what was extinguished in this purported novation in the spring of 2016? The quintessential example of a novation, and most of the cases sort of deal with this fact pattern, is there's a debt. There's some sort of debt that the debtor owes the creditor, and for whatever reason, maybe circumstances have changed, the debtor can't make that payment. They undo that agreement and they come up with a new agreement for the payment of the debt. Well, this is an insurance policy. It's a different scenario. At this point in time, at the beginning of the reconstruction work, there was no fixed obligation. There was a covered loss. Travers acknowledged it was a covered loss, knew that it would be paying for the covered loss under the policy. But at that point in time, there was no fixed amount to do. That's what they were trying to figure out. How are we going to value this going forward? So there was no specific debt, no amount to be extinguished at that point in time. It was completely unknown. So Contegra says, well, what was being extinguished was the entire insurance policy. The entire contract was going to be set aside in favor of a construction contract. And Contegra argues in its brief that the motivation for Travers to do that was that Contegra could have said, we at Contegra, we're not going to do our own reconstruction work. We're going to hire another third-party contractor, general contractor, to do all this work. And had Travers, had Contegra done that, Travers' exposure may have been greater under the policy. Well, that's an interesting argument because, again, why would Travers replace one unknown exposure, which at that point its exposure under the insurance policy was not yet known, with another unknown exposure, a time and materials contract, that it wouldn't know what that exposure is until the work was performed. It doesn't make any sense. And there's nothing in the record that supports the argument that the parties had any discussion with each other whatsoever about getting another contractor to do this work. Travers acknowledging that, oh, if you do that, Contegra, we, Travers, might have some exposure. The pros and cons of this were not discussed as far as we know. There's nothing in the record to suggest that that was discussed. There's nothing in the record to suggest that Travers saw a benefit of replacing its insurance contract. It's an insurance company, one of the largest in the country. It's in the business of insuring risks and paying losses under an insurance policy. It's not a contractor. It's not what it does. There's nothing in the record that suggests that Travers saw some benefit of replacing one unknown exposure with another. And indeed... Counsel, if we inferred from Travers that the contract was in tune with Travers and Contegra, do you agree that policy provisions on appraisal and compliance with them became inapplicable? I don't agree that they did not become inapplicable. First, we, of course, disagree that that's... We believe the policy remained in force at all times. But even if the premise of your question is you affirm that there was an ovation and that there was a time and material construction contract, the parties nevertheless voluntarily entered into an alternative dispute resolution forum. Travers said, let's go to appraisal to resolve this dispute, and Contegra said, okay, we will. Parties can do that all the time. They don't need it to be in the contract to do that. Courts favor ADR. They voluntarily entered into an appraisal where the value of this work was decided in a fair and neutral forum, an appraiser chosen by each side, an umpire selected by the two appraisers. And in that process, the dispute was resolved. Contegra never challenged the dispute. So we would submit that if the court took that approach and affirmed the novation, that doesn't undermine the appraisal. The parties still agreed to do the appraisal. It was never challenged. There was an award. All of the issues about the cost and the reasonable and necessary cost were vetted and dealt with in that appraisal, and there's no reason not to affirm the results of the appraisal. Going back to the novation, clearly here, and Contegra does not argue otherwise, there was no express novation. There is no document that the parties signed that says we agree to cancel or novate or extinguish the insurance policy and enter into a construction contract. There is no expression of that in writing. Contegra does not disagree with that. Again, I think that's telling. It would seem strange to me that an insurance company would agree to set aside its insurance policy without stating that in writing and stating in writing what the terms and conditions of this new contract would be. It's unfathomable. If I can interrupt, you discussed the unknown exposure, trading one unknown exposure for the other. I believe that Contegra in their brief discusses this idea that there was a benefit, that the benefit was this avoidance of the liquidated damages clause. Can you respond to that? Sort of, because I don't fully understand it myself. I've read that provision, that paragraph in the brief many times. I don't understand it because, first of all, it's a hypothetical. It wasn't discussed. There's no evidence in the record to suggest that the parties even vetted that concept, talked about it, considered having somebody else do it and what that would mean for travelers. Contegra still had to honor its underlying contract with the project owner. Contegra does not point to any provisions in the policy that would deal with the liquidated damages that travelers would owe if the work was not performed timely by Contegra. Whether or not Contegra did the work or had somebody else to do the work, travelers would not be on the hook in perpetuity for whatever length of time it took for Contegra to get the work done. Contegra would have to act with reasonable speed under the policy to get the replacement done, whether or not it did it or somebody else did it, so there would still be mechanisms in the policy to cap travelers' exposure for whatever delay took place on the underlying project. So that argument was a little bit lost on me. But, again, I don't see that it was ever discussed or considered by the parties. So Contegra acknowledges that there was no express novation, but the law, they cite to it, and the law does allow for an implied novation, which can be implied from the circumstances or the subsequent conduct of the parties. But Contegra never discusses what those circumstances are or what the subsequent conduct of the parties were that gives rise to this novation other than the e-mails that they say constitutes this new contract. The reality is that the circumstances support the exact opposite conclusion, that the parties did not intend an ovation. For starters, there is no evidence that James Ellis, who was Traveler's Adjuster, had any authority to replace an insurance policy with a construction contract. Mr. Ellis is an insurance adjuster for travelers. He adjusts insurance losses under the policy. There is no authority that he could set aside the contract on behalf of travelers and enter into a construction contract. But even if he did, it is not credible that he would do so through two e-mails that barely have any information, that he would not state in writing that this is what we are doing or set forth what the terms would be. It's simply not credible. Mr. Orlando, the court arrived at this finding, it seems to me, by deciding disputed facts. Do you agree with that? I do, in a way. Going back to Mr. Ellis and his counterpart, Mr. Bernard, if you look at the record, they were in disagreement about what they purportedly agreed to. Well, your argument was that Mr. Ellis would be not credible to think that he would enter into a contract. So when you start talking about credibility to me, it sounds more like this is something that a finer fact should determine, not a summary judgment. No, I don't think legally you can get there. I think that Mr. Ellis agreed that there was a time and material agreement as to how to value the loss. The question is what does that mean? Does that mean that we're still under the insurance policy value in the loss or that it was novated and a new policy was formed? I do believe that the court below and the court here can decide the novation issue as a matter of law. I believe both parties took that position in the court below, and I believe that to me the dispute or the not meeting of the minds between Mr. Ellis and his counterpart at Contegra, Mr. Bernard, about this whole issue of whether they entered into a new contract establishes that there wasn't a meeting of the mind. There wasn't a mutual agreement to enter into a new contract. They clearly reached an agreement to value the loss on a time and material basis. There was no mutual agreement to enter into a new contract. So in the court's order when it makes a finding and then says, even though travelers disputed this paragraph, additional facts that cited as support do not prove that Supreme actually billed for labor rates that are different than those agreed upon by the parties, I'm looking at paragraph 42 on C3412, volume 3. That kind of statement appears throughout the court's order, even though somebody disagreed. It seemed to me that when you make those kinds of antithetical comments, you're deciding facts that are not appropriate for summary judgment. Well, I think it's not clear to me that what you cited there, Your Honor, goes to the crate. Whether or not they were still operating under the policy or had this new contract that they were formed, I think the court was making comments about the value of the loss and trying to decide, okay, even if we assume we have a time and material contract, we still have to decide, is that the amount to be paid under the time and material contract? Our view on that is, well, we have a binding appraisal, and that was the forum that decided the value of this work. So our position below is that the appraisal is binding. That set the value. No matter whether or not it's under the time and material supposed contract or the policy, the appraisal is binding, and that set the value. There is nothing to try. There is nothing to litigate as to the value of the work. I see. Okay, thank you. I see my time has expired, so I don't know if there are any other questions at this time. Justice Long? No questions. Justice Sharkey? No questions. I'm sorry. Sometimes we get to talking and I don't notice the time button. But, Mr. Orlando, you will have a few moments after the appellee's argument for rebuttal. I can't read your writing. I'm sorry. I will. Dean Wilson, Your Honor. Okay, Mr. Wilson. And do you represent Contemporary Construction? I do, Your Honor. Okay, we'll hear from you next. Yes, you sir. Yes, sir, you may. Thank you. It's my eyes, not your writing. I apologize. I can print very small, so maybe I need to print a little larger. Good morning, Your Honors. May it please the Court. I'm Michael E. Wilson on behalf of Contemporary Construction, one of the two appellees. Since there are a couple of questions raised by the panel, I'd like to respond to those questions first. The question regarding sort of raising in the record, is there a material issue of fact? What's important, I think, here from the appellate process is that neither party raised a question of whether there was an issue, a genuine issue of material fact. It was not briefed, so no one is contending that there is a flaw in the judgment in terms of deciding an important issue of fact that would control the decision. That's not an issue on appeal. Another issue that was raised was assuming that there is a time and material contract, is the appraisal provision bound by any? And what the trial court found in the judgment, which has not been contested on appeal by travelers in the trial court judgment, in paragraph 22, which is in the appendix of A37, furthermore, in reaching their T&M contract, Travelers, Contegra, and Supreme did not agree to an appraisal. So as part of the overall T&M contract that was reached through email, a meeting on April 25th and confirmed in a second email, as well as confirmed and corroborated by testimony from Mr. Ellis, the adjuster, and by Mr. Bernard on behalf of Contegra, and by Mr. Whitford, who was a witness at the April 25th meeting, there was a time and material agreement reached, which we set forth all the details. Time and materials, general conditions, costs were covered, and a markup of 20% for overhead and profit. Now, that's important, and so the backdrop is also important. Yes, there was a dispute over the mitigation and demolition costs, and that dispute ended up being resolved. The parties settled it. A different Tony McDonald company called T. McDonald was the demolition contractor acting as a subcontractor to Contegra, and issues over payment occurred among Travelers, Contegra, and T. McDonald Construction. The parties settled that, but they sat down and said, we need a new framework to deal with the reconstruction, and the new framework included those terms I've just discussed. The argument made, and it's important, again, in looking at the appellate process, what we're supposed to argue and what has been waived and not argued. And the Illinois Supreme Court and the courts of appeals in this state have both agreed that an issue not raised at the trial court level cannot now be raised on appeal. And what we have in terms of the time and material contract is the argument raised at the lower court level, pardon me, was there was no assent between Travelers and Contegra. That was the primary argument. The second one over that issue was there was no modification to the policy, therefore it has to be the policy. So it seems to me there are three scenarios that one could look at this fact pattern and apply the applicable principles of contract law and novation. One scenario is the policy controls. The policy does not control. And the reason the policy does not control is in the record, quoted by both parties, but also at 1324, C1324, is part of the builder's risk policy that says how to value the loss. And to value that loss, it's one of three categories. Limit of insurance, well, that doesn't apply. That was $14 million. The costs weren't even close to that. And it's the least of these three categories. The second one is the cost to replace. And the cost to replace is actually defined later in that same clause to include general and specific overhead and profit. That looks good. The third one is the amount you actually spend, you being the insured. And in this case, Contegra, as the general contractor in the overall project, was the insured that is necessary to repair or replace. That amount, that Contegra's expense, does not include overhead and profit. So the agreement that was reached with the general adjuster, who said he had the authority, who ran it by Mr. Gibbs, that's in the record, too, his superior, who authorized the T&M agreement, those terms included overhead and profit, which would not be paid under the valuation of loss terms of a policy. So if the policy doesn't control, well, maybe it's a modification of the policy. But the argument that Trav was made, and they made it at the trial court level, and they've made it on appeal both in their original brief at page 6, I'm sorry, page 29, and in their reply brief at page 6. No modification was made because there was no endorsement to the policy, and that's the only way to modify the policy. So the policy doesn't apply. No modification or endorsement applies. The parties must have reached a separate agreement. Now, we've pointed out the four elements, I believe, of novation do, in fact, apply in this case. And novation can be, as Mr. Orlando pointed out, it can be expressed or it can be implied. I think the circumstance demonstrates that it was implied. There was originally an agreement, the policy, and the obligation under that policy was to pay for the valuation of loss per those terms that I've just referenced in the policy, in the builder's risk policy. But instead, the parties sat down, and those parties included Supreme. And the court found that Supreme was also a party. Supreme was not a party to the policy. They were a party to the TNM agreement. So we had a three-party agreement. Now, under the policy, Contegra was the named insurer. They had no obligation to perform the work. The policy simply states that they could receive payment. Obviously, they had an interest. Contegra had an interest in performing the work. And it is in the record that the policy has coverage. And, in fact, in the notes that are in the appendix to the traveler's brief are the traveler's notes. And there's a reference in those notes to a possibility of having to pay delay-related damages to the owner. That's covered in the builder's risk policy. So not only is the direct loss covered, but delay damages are covered. And there was a concern about that. And so travelers had an interest over that. So did Contegra in trying to get the job done as quickly as possible. And this was, obviously, with all the storm damage affecting all 44 units, and a rebuild had been modeled, developed units, fabricated in a shop, and doing them out in the field was a far different process, much more complex, meeting local codes. That was a process that Contegra wanted to manage. And travelers, in fact, agreed to the terms to say that, Contegra, if you do the work, we'll pay you your overhead and profit that you want, 20%. Are you saying that that was the motivation for the novation? I think that is a motivation as part for the novation, which is the other motivation was there was a dispute over the mitigation and demolition and how that was happening in terms of payment. And so the party sat down in March, and then an email followed that that confirmed that Contegra wanted time and material terms. And then April 19th, there seemed to be a little bit of misunderstanding about what was going on, and Contegra made it clear, we've got to have time and material. And that's when, on that same day, it was confirmed. Now, other terms necessary to fix the overall price were ultimately agreed on April 25th at the meeting and followed by the confirmation by the traveler's email from Mr. Ellis on April 29th, which included clerking the works, which is not a problem. Clerking, as explained in the letter, is simply monitoring the hours, looking at the timesheets as they come in daily, making sure they're okay. And then when the invoice comes in, making sure those timesheets are reflected in the invoices correctly. That's all it meant, not what ultimately became in dispute. So the novation, Your Honor, there's a new agreement, and the conduct demonstrates that there was a new agreement because there were terms and conditions in terms of the overhead and profit that were not part of the policy. And, counsel, you mentioned that as part of the new agreement, they did not agree to the appraisal process, correct? We did not, and the Court so found that they did not agree to that. That's paragraph 22 of the summary judgment. The Court also found in paragraph 24 that the parties did not agree to the two-year suit limitations provision in the policy, that the T&M agreement included price that I've been talking about. The scope was reconstruction, so once the demolition and mitigation was done, they knew now what to replace. That was per plans and specifications that were part of the project. But wasn't there ultimately, though, an appraisal that was conducted? I'm sorry? Wasn't there ultimately an appraisal conducted, though? Was there any appraisal? There was an appraisal that was done by both parties, yes, Your Honor. So they didn't agree to an appraisal, but they had an appraisal anyhow? They participated in an appraisal, yes, Your Honor. And our position is that that was not binding on us, and as we briefed, one of the main points for that is an appraisal is, under clear definition of the term, a common understanding of the term, it's supposed to be estimation of the value of loss. At the time they went through this process, the loss was known. The costs were known. There was no need for an estimate of the value. But I'm having a hard time understanding, if there was an agreement as to a time and material contract, what was the necessity then of the appraisal? There was no necessity for the appraisal. It seems as though that they took this e-mail and then they took some pieces of the policy that suited them and utilized them so that there wasn't a complete contract represented by the e-mails, if you will. Your Honor, we're not suggesting the e-mails alone set forth the contract. The e-mails along with the meeting on April 25th, as confirmed by Mr. Whitford, he testified, he was within line, that there was a T&M agreement reached. Supreme and Contegra and Travelers were all part of it, and it was to cover the reconstruction. So the major components of a contract are, for construction, a scope, a price, schedule. Well, there's no express schedule, but it was implied. You have to do the work in a reasonable time. And so those were the major components. And, of course, quality of work. And the quality of work is also implied, that they're going to do the work in a good workmanlike manner. And, frankly, they've got to follow the plans and specifications to satisfy ultimately the project owner. So I believe there was a binding agreement. The trial court so found. And the only argument raised at the ‑‑ you can't convict the trial court of an error unless the error is brought to the trial court's attention. The only point raised about the T&M contract was no assent. Clearly, Mr. Ellis said, we agreed to the T&M terms. So there was assent. And so I don't think on appeal there should be any question that there was a binding time and materials contract reached. And that did not conform to the terms of the policy. There was no endorsement. Therefore, there must be a novation. And I think we fit all four elements as we brief. I have other arguments in our brief, but I think I'm running out of time. So at this point, I'd like to stand on our brief as well. Thank you very much. I have one question.  I just want to make sure that I'm reading the correct email. Are you saying that the assent by Mr. Ellis was on May 3rd? No, Your Honor. What was the date of the assent? The date of the assent was actually, depending upon what terms, because you have to get through all the key terms, April 19th, there's an email of that date. And, Your Honor, I can give you the sites and the record if that would help. I have some of them in front of me, which is why I'm asking. No, that's fine. I've got them listed here. So the April 19th is a series of emails are C884, 883, and 884. And in the April 19th, I'm quoting, and park travelers will agree to compensate for this work on a T&M basis by installing a clerk on the job site that goes on. That's one of the 809. April 25th, they discussed further details, including agreeing on the labor rate. That's in Mr. Wickford's deposition testimony. We cite that in the brief. And they also ultimately agreed on the 20% overhead and profit, which was confirmed in the April 29th email. And that April 29th email is C1025 and 1026. Travelers is in agreement with the rates presented, and I'm quoting from the April 29th, with the rates presented on the attached rate sheet. Per our meeting on April 25, travelers in agreement with the general conditions outlined in the GC attachment. Travelers agrees to a 20% overall markup on not only mitigation, but reconstruction. And you think that those few lines represent the entire contract, the time and material contract? I do. Absolutely. Those are sufficient terms, if you will. Sorry. I think those are material terms. And, yes, it's very brief. One would say shorter than a full-length negotiation over a typical construction contract. But I believe they're sufficient to set forth scope, price, and then the other two implied terms are workmanship, quality, and schedule, reasonable time. And the court so found, and I don't believe that's an issue on appeal other than the question of assent that was raised before the trial. Thank you. You would agree that assent goes to the terms of the contract, but each term has to be assented to whether that's implied or expressed. I agree that the parties have to mutually agree to the terms. Okay. Thank you very much. Material terms. Thank you. Any other questions? No. Thank you. All right. Mr. Orlando. Mr. Bell. Thank you. Thank you, Your Honors. The issue is intent. What did the parties intend through this e-mail exchange back in March and April of 2016? Counsel points to a provision in the policy which he believes shows the intent, and I think it's a misreading of the policy, and it has to do with the overhead and profit. The policy limits what travelers is going to pay or owes for a loss to the lesser of the limit of the policy. He's correct that the limit wasn't at issue here. Number two, the cost to replace at the same job site the lost or damaged property with other property of comparable material and quality used for the same purpose. Or three, the amount you actually spend that is necessary to repair or replace the lost or damaged property. Number four, the cost to replace covered property includes labor and delivery charges, general and specific overhead and profit. A natural reading of that provision would indicate that the overhead and profit applies to all of the four going one, two, three. It isn't a subset of one of the three. It follows as its own number four. So we believe that the overhead and profit was always to be a part of the loss valuation. What they agreed at was the 20%, the amount of the overhead and profit in those emails. But even if somehow that constitutes some sort of modification of the policy because overhead and profit was only allowed for number two but not number three and they were valuing it under number three, to your question, Your Honor, that doesn't fill in all the gaps of all the other terms and conditions of the so-called policy. All they did in that case was modify or agree to a deviation of that particular loss valuation provision. It has nothing to do with all the other terms and conditions in the policy. There's no evidence that the parties in doing that said, well, this two-paragraph email now constitutes our entire bargain. And, again, if you look at how this played out, it proves the point. How can there be a three-party agreement in which Supreme is supposedly a part of this agreement and therefore could have direct contact with travelers under a time and materials contract? Supreme, if this contract existed, could have submitted its invoices directly to travelers if it believed we had that contract, but that's not what happened. Contegra and Supreme entered into a full-blown construction contract. And we're led to believe that they did that. They entered into a construction contract. The policy pulled a month away and travelers was hanging onto a couple of emails as their construction contract with Contegra and Supreme. It simply doesn't make any sense. Supreme wouldn't have entered into that solid construction contract if it believed it had a contract with travelers. The best evidence of all of this, and I believe it's at 971 in the record, is the November 16, 2016, letter, so this is long after the work is, or close to when the work was done. I believe Inline had already audited four to six invoices at that point. This is Contegra writing to Mr. Ellis at Travelers about not being happy with the deductions that were being taken. If you read that letter, it is impossible to believe that Contegra believed it had a time and materials contract and wasn't operating under the policy. The letter refers to the policy numerous times. It refers to a supplement in the policy that Travelers was applying. It was one of the basis for knocking out some of the charges, was a $100,000 supplement, and Contegra conceded in the letter that the supplement applies. Now, how could that supplement apply if the policy no longer existed? Contegra never believed the policy did not exist anymore. It understood at all times it existed, which is why it participated in the appraisal. It participated in the appraisal because that was a term of the policy. The policy still existed. It never challenged the appraisal. Contegra never said, Travelers, why are you demanding an appraisal? We didn't agree to that at the time of the materials contract. The policy doesn't exist anymore. They went to the appraisal because they believed the policy was still in force in effect. So unless the Court has any other questions, I too will rest on my brief. Just a shout-out. No questions. Is there just one? No questions. Okay, thank you, Mr. McClendon. Thank you both counsel. This is a very challenging case, considering all the parties. The briefing was excellent. And we will take the matter under advisement and issue an order in due course.